### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02612

DR. ERFAN IBRAHIM,
Plaintiff,

v.

ALLIANCE FOR SUSTAINABLE ENERGY, LLC,
Defendant.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW the Plaintiff, Dr. Erfan Ibrahim, by and through his attorneys, Miller & Law, PC, and for his Complaint against the Defendant, Alliance for Sustainable Energy, LLC, states as follows:

### NATURE OF THE ACTION

This action is brought to redress the Defendant's violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e–2000e-17. Specifically, Plaintiff alleges that the Defendant discriminated against him based on Plaintiff's race, national origin, religion and gender. Defendant, directly and through its agents, escalated its discriminatory treatment of Plaintiff by terminating his employment, in violation of Title VII.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343. This action is authorized and instituted pursuant to 29 U.S.C. § 626(c), Section 706 of Title VII of the Civil Rights Act of Title VII, as amended. The unlawful employment practices alleged herein were committed within the jurisdictional boundaries of the United States District Court for the

District of Colorado and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the acts complained of herein all occurred within this judicial district.

## ADMINISTRATIVE PREREQUISITES

2. Prior to filing this Complaint, Plaintiff complied with all procedural prerequisites for bringing this lawsuit. On August 13, 2018 Plaintiff timely filed a charge of employment discrimination and retaliation with the United States Equal Employment Opportunity Commission ("EEOC").

3. By notice dated August 28, 2018, which was received by Plaintiff on or about August 30, 2018, Plaintiff was issued a Notice of Right to Sue ("Notice") by the EEOC notifying Plaintiff that he had ninety days from the receipt of the Notice to file this Complaint. This Complaint has been filed within this ninety-day period. Therefore, under 42 U.S.C. §2000e-5(f)(1), Plaintiff has satisfied all procedural prerequisites for suing Defendant in federal court.

## PARTIES

4. Plaintiff, Dr. Erfan Ibrahim ("Dr. Ibrahim" or "Plaintiff"), is an individual resident of California with a residential address of 1021 Golf Court, Mountain View, California 94040.

5. Defendant, Alliance for Sustainable Energy, LLC ("ASE"), is now, and was at all relevant times, a Delaware limited liability company, with its principal place of business located at 15013 Denver West Parkway, Golden, Colorado 80401. At all relevant times Defendant has had at least 15 employees and is capable of being sued under Title VII and is subject to the jurisdiction of this Court under that statute.

6. ASE operates the National Renewable Energy Laboratory ("NREL"), a national laboratory of the United States Department of Energy, Office of Energy Efficiency and Renewable

2

Energy, which is located at 15013 Denver West Parkway, Golden, Colorado 80401. ASE and NREL are collectively referred to herein as "Defendant."

## GENERAL ALLEGATIONS

7. Dr. Ibrahim is a United States citizen of Pakistani descent.

8. Dr. Ibrahim is a member of the Muslim religious faith.

9. Dr. Ibrahim was employed by Defendant for approximately three years, from March 9, 2015 to March 2, 2018.

10. Throughout his employment with the Defendant, Dr. Ibrahim held the position of Center Director for the newly-established Cyber-Physical Systems Security & Resilience ("CPSS&R") Center at NREL's Golden, Colorado laboratory.

11. During his employment with the Defendant, the vast majority of Defendant's leadership was comprised of Caucasian males, with a few token females and minorities.

12. Two minority Center Directors (including Plaintiff), in addition to one female Center Director, were replaced by Caucasian males during 2017-2018, creating an even larger disparity in favor of Caucasian males among Defendant's leadership.

13. ASE handles all the hiring and firing at NREL and provides all the employee benefits at the lab.

14. During this three-year period, Dr. Ibrahim developed the CPSS&R from a concept on paper into a multi-million-dollar R&D program with both public and private sector funding.

15. Dr. Ibrahim built a team of seven technical and business development staff, wrote proposals for funding opportunity announcements, managed R&D projects and presented the R&D work results at major electric sector conferences, panel discussions and workshops.

16. Dr. Ibrahim also managed a Smart Grid Educational Series webinar forum with a

3

distribution of over 5,000 people across 10 countries that held monthly webinars on critical topics in Smart Grid, Energy Efficiency and Cybersecurity from a technology, business process and policy perspective.

17. Dr. Ibrahim's immense success as Defendant's Center Director earned him a "successful or exceeds expectations" rating for his job performance during each of the three years of his employment.

18. Dr. Ibrahim was awarded generous year-end bonuses at the end of 2015, 2016 and 2017 and was highly praised by his then-supervisor during each of those years.

19. Well-liked and respected by his peers, Dr. Ibrahim did not have any negative reports of any kind lodged against him while he was employed Alliance during 2015, 2016 and 2017.

20. Even though Dr. Ibrahim's performance was satisfactory, and although the CPSS&R program continued to grow steadily throughout Dr. Ibrahim's employment, there was a dramatic shift in the tone of senior management toward Dr. Ibrahim personally that occurred after June 2017, when Dr. Ibrahim's original supervisor left for another job and was replaced by Juan Torres.

21. Mr. Torres came to NREL from the Sandia National Lab as the new Associate Lab Director at Energy Systems Integration Directorate that included CPSS&R.

22. Almost immediately upon his arrival at NREL, Mr. Torres began exhibiting a professional bias towards Dr. Ibrahim, and began marginalizing him.

23. Within three months of his arrival at NREL, Mr. Torres changed Dr. Ibrahim's job title from Center Director to Research Advisor.

24. The change in Dr. Ibrahim's job title brought with it a corresponding reduction in the amount of bonus compensation to which Dr. Ibrahim would be eligible to earn.

25. Mr. Torres informed Dr. Ibrahim that he was going to hire a new Center Director for Cybersecurity who possessed a security clearance.

26. Mr. Torres further indicated that Dr. Ibrahim's entire staff would be reporting to the new Center Director and that Dr. Ibrahim would merely be a single contributor thereafter, even though Dr. Ibrahim would still be responsible to generate business on the unclassified side and manage the unclassified projects.

27. Mr. Torres did not recognize the value of Dr. Ibrahim's work and engaged in numerous demeaning and demoralizing communications with Dr. Ibrahim about this work, even though it was the only tangible revenue coming to NREL in cybersecurity before Mr. Torres arrived, or at any time during the 16 months that have followed Mr. Torres' arrival at NREL.

28. Mr. Torres had been hired by the new NREL Director, Martin Keller, who was pushing for NREL to perform classified R&D work in the cyber sector.

29. Like Mr. Torres, Mr. Keller did not value Dr. Ibrahim's work at NREL and frequently expressed his dissatisfaction with the services-oriented nature of the unclassified cyber R&D work that Dr. Ibrahim was managing.

30. Mr. Torres rarely offered any praise for Dr. Ibrahim's work, and he often would go out of his way to demonstrate the error in Dr. Ibrahim's ways and to exaggerate any criticisms that he would hear about Dr. Ibrahim from the Department of Energy, NREL staff and/or other industry stakeholders.

31. Notwithstanding this constant barrage of negativity and hostility, Dr. Ibrahim continued to generate new business for NREL, he continued to be invited to high profile industry speaking engagements, and he continued to receive accolades for his work from the industry.

32. As the workplace negativity and hostility that was being directed toward him

continued to escalate, Dr. Ibrahim's intuition strongly suggested to him that NREL management would seek a pretext to get rid of him; he constantly wondered when the axe would fall on his job.

33. Dr. Ibrahim had no idea how low that the new NREL leadership would stoop to accomplish their goal of eliminating Dr. Ibrahim from NREL.

34. NREL management proceeded to manufacture a pretextual basis to terminate Dr. Ibrahim's employment.

35. On March 2, 2018 NREL Senior Management terminated Dr. Ibrahim's employment, citing two instances on which Dr. Ibrahim purportedly demonstrated "poor management acumen" and behaved in an inappropriate manner.

36. These two instances involved Dr. Ibrahim's verbal and text message communications with a female administrative assistant between January 4, 2018 and January 21, 2018, and verbal communication with a female assistant consul of a UK mission on February 5, 2018.

37. The pertinent background and communications with respect to the administrative assistant are as follows:

   a. Dr. Ibrahim offered to pay for a rental car for one of his administrative assistants who was temporarily doing Dr. Ibrahim's travel booking and reimbursements and arranging lab access badges for guests.

   b. Dr. Ibrahim also invited this administrative assistant to go to a movie with him as friend.

   c. In communicating with the administrative assistant, with whom he had developed a good social rapport over the course of the prior year, Dr. Ibrahim made it very clear to her that he wanted their relationship to remain purely a friendship; the reason that he did so was precisely because she worked within Dr. Ibrahim's directorate, and he did not want anything to impact their positive professional relationship.

   d. There was nothing remarkable about his communications with this administrative assistant; Dr. Ibrahim had already been socializing with his direct reports and colleagues within his directorate, both male and female, and including both single and married administrative assistants, during the previous 34 months without any issues or HR complaints.

6

    e. Further, Dr. Ibrahim had bestowed gifts (including monetary gifts) on special occasions to numerous members of the administrative staff within his directorate – including this particular administrative assistant - as gestures of goodwill throughout the previous 34 months without any issues or HR complaints.

    f. Dr. Ibrahim had given this administrative assistant a monetary gift at Christmas in 2016, along with the other administrative assistants; no complaints were lodged regarding this gesture of kindness.

    g. Only a couple of weeks before their conversations regarding the rental car and going to a movie, the administrative assistant had accepted Dr. Ibrahim's invitation to attend a special lunch that he hosted at NREL to recognize volunteers who had participated in a Christmas drive for local families in need; the administrative assistant attended this lunch without incident or complaint.

    h. The administrative assistant initially accepted the rental car gift and showed a willingness to go to a movie, but she changed her mind several days later, stating to Dr. Ibrahim that she felt conflicted about accepting his offers and that she simply wanted to remain as friends at work. She stated that she thought that Dr. Ibrahim may have gotten the wrong idea.

    i. Dr. Ibrahim responded that he respected her decision and made it clear that his intentions were purely platonic, and that he simply wanted them to remain as friends.

    j. Dr. Ibrahim did not in any way behave or communicate in an indecent or inappropriate fashion with respect to the administrative assistant, who specifically acknowledged in a text response that Dr. Ibrahim's intentions were coming from a place of generosity and kindness.

    k. Nevertheless, the administrative assistant later reported the incident to NREL's HR Department and requested that she no longer handle Dr. Ibrahim's travel or arrange for guest badges his center.

38. Dr. Ibrahim was called into a meeting by Mr. Torres in late January 2018 to discuss the concerns that Mr. Torres claimed had been raised by the administrative assistant.

39. Mr. Torres conceded that there was no NREL policy that had been violated.

40. Dr. Ibrahim received no written warning of any kind from NREL Management or its HR Department in connection with this matter.

41. Mr. Torres asked Dr. Ibrahim not to extend such offers to employees who worked under him, as Dr. Ibrahim was a high-level executive at the lab, and he requested that Dr. Ibrahim

7

simply move on and not approach this administrative assistant to discuss the matter.

    42. Dr. Ibrahim fully complied with Mr. Torres' requests.

    43. The pertinent background and communications with respect to the assistant consul are as follows:

a. On February 5, 2018 Dr. Ibrahim spoke briefly with an assistant consul of a UK mission who was visiting as part of a cyber delegation to NREL.

b. He apologized to the assistant consul that he had not had an opportunity to spend any time talking with her during her half-day visit to NREL as he had done with others in the group, so he suggested that they catch up at the evening networking reception that was being hosted by the local UK consulate in downtown Denver for local business and government personnel to network with the UK cybersecurity delegation.

c. At the reception, Dr. Ibrahim made the social rounds and he eventually approached the assistant consul to say hello and chat briefly in a room filled with people.

d. During the conversation, based on their interactions, Dr. Ibrahim expressed his intuitive feeling that they might have a connection that would enable them to be friends as well as professional colleagues; Dr. Ibrahim has occasionally expressed this feeling to both male and female acquaintances upon meeting them for the first time in professional and social settings.

e. Responding to Dr. Ibrahim's questions, the assistant consul casually told him that she lived on the west side of Los Angeles with her boyfriend; Dr. Ibrahim thus would have had no logical reason to pursue any romantic involvement with the assistant consul.

f. The assistant consul also told Dr. Ibrahim that she represented UK and US companies in the manufacturing sector that wish to enter the other market; Dr. Ibrahim responded that they perhaps could meet for lunch during his next visit to Los Angeles, to discuss her work with these companies and how NREL's cybersecurity services might be of interest to her clients and to explore whether she could facilitate Dr. Ibrahim's introduction to these clients. The assistant consul said that she was not into cybersecurity. Dr. Ibrahim requested that she simply make the introduction to her client companies and he could take it from there. This was a normal request of industry peers whom Dr. Ibrahim met at professional gatherings as part of his business development efforts to grow the CPSS&R R&D program.

g. Dr. Ibrahim then observed that manufacturing is a male-dominated sector, and he inquired how the assistant consul dealt with men in that sector who might not take her seriously as an attractive, young female; the consul responded that she often travels in teams or simply ignores the men in these settings who behave in that fashion.

h. Dr. Ibrahim accepted her response, and the two engaged in general conversation for a few

more minutes before the assistant consul politely excused herself, explaining that she needed to speak with a couple of her colleagues. Dr. Ibrahim remarked that it was nice to meet her and then he moved on to speak to other guests at the reception before leaving for dinner with two people he met there who were interested in conversing further. The assistant consul did not demonstrate any visual or verbal signs of discomfort during her conversation with Dr. Ibrahim and answered his questions politely and with a smile.

   i. From that point forward, Dr. Ibrahim did not contact the assistant consul in any fashion; he left it up to her to decide whether she wished to follow up on the conversation.

44. Three weeks later, on February 26, 2018, after returning to Denver from business travels, Dr. Ibrahim was summoned by Mr. Torres for another meeting.

45. This time, Mr. Torres was accompanied at the meeting by NREL's ESI HR Manager, Mary Ann Potter.

46. Mr. Torres and Ms. Potter informed Dr. Ibrahim that NREL had received a complaint about Dr. Ibrahim from a woman who had attended the February 5 reception; they asked if anything had happened at that event.

47. Dr. Ibrahim immediately cooperated in answering their questions, and he was fully forthcoming about the details of his conversation with the assistant consul.

48. To Dr. Ibrahim's surprise and dismay, instead of confirming that his interactions with the assistant consul were unremarkable, Mr. Torres and Ms. Potter purported to be upset with him, accusing him of supposedly having "come onto" the consul and making her feel uncomfortable as she allegedly had complained.

49. Mr. Torres and Ms. Potter accused Dr. Ibrahim of having asked an inappropriate question and stated that there appeared to be a "pattern" of women misunderstanding the things that Dr. Ibrahim said to them.

50. Ms. Potter continued by asserting that, "once something is perceived a certain way, the truth does not matter. Perception becomes the truth."

9

51. Mr. Torres and Ms. Potter announced to Dr. Ibrahim that the situation had turned into a "US-UK matter" because it was escalated by the U.K. Embassy in the U.S. through U.S. Government channels and brought to the attention of the Alliance and NREL senior management, and that he was being placed on paid administrative leave pending the results of an investigation.

52. Dr. Ibrahim was forced to immediately surrender his keys, his secure ID fob and his badge, and to exit the NREL campus and remain away during the paid administrative leave period and he was instructed to not discuss the matter with any fellow employee.

53. Four days later, on Friday, March 2, 2018, Mr. Torres and Ms. Potter called Dr. Ibrahim to notify him that his employment was terminated. A courier was dispatched to Dr. Ibrahim within two hours thereafter to deliver his termination papers and pick up his work laptop.

54. Dr. Ibrahim was denied due process in connection with his termination, and he was never shown a copy of either complaint to verify the accuracy of the purported allegations against him as they were relayed by Mr. Torres and Ms. Potter.

55. It is undisputed that Dr. Ibrahim did not violate any NREL policy as stated in its employee handbook in either case.

56. By any reasonable standard of conduct, Dr. Ibrahim was neither indecent, inappropriate nor unprofessional in his communications with the administrative assistant or the assistant consul.

57. Dr. Ibrahim did not express even the slightest romantic interest, through words or actions, in either the administrative assistant or the assistant consul.

58. Neither the administrative assistant nor the assistant consul expressed or demonstrated any displeasure or discomfort whatsoever with Dr. Ibrahim's words or actions at the time of the respective communications at issue.

59. Upon information and belief, to the extent that the administrative assistant and/or the assistant consul actually complained to Defendant regarding their communications with Dr. Ibrahim, such complaints were the direct result of racial, ethnic and/or religious bias and/or stereotyping of Dr. Ibrahim as a Middle Eastern and Muslim male.

60. Defendant's assertion that there has been a "pattern" of Dr. Ibrahim having his innocent intentions misconstrued or misinterpreted by women is pure fiction.

61. Prior to the purported accusations in January and February 2018, Dr. Ibrahim had worked without incident for 31 years in numerous work environments, including three years at NREL.

62. During these three decades, Dr. Ibrahim has attended numerous conferences and work-related social gatherings as a single man, and he has developed friendships and occasionally pursued romantic relationships with females that he has met at such conferences and gatherings, as he is perfectly entitled to do; prior to the alleged 2018 complaints, there had never been a single complaint lodged against Dr. Ibrahim in all of that time.

63. Upon information and belief, Defendant manufactured, grossly exaggerated and/or manipulated Dr. Ibrahim's communications with the administrative assistant and the consul as pretext in order to carry out its predetermined discriminatory goal of terminating Dr. Ibrahim's employment.

64. Defendant hired a Caucasian male to replace Dr. Ibrahim, an individual who, upon information and belief, has no cyber expertise.

65. To date, the plan to build a classified R&D program at NREL has not shown any tangible progress; there are no technical personnel in Defendant's current cyber program who have clearances to perform classified work, and NREL has no secure facilities to perform such work

11

onsite.

66. In terminating Dr. Ibrahim, Defendant violated its own policies and procedures, which required in pertinent part that, prior to termination, Dr. Ibrahim first be placed on a Performance Improvement Plan ("PIP") and given an opportunity to correct or improve upon the subject behavior.

67. Dr. Ibrahim was never placed on a PIP by Defendant.

68. In terminating Dr. Ibrahim, Defendant treated Dr. Ibrahim in a disparate fashion than at least three similarly-situated Caucasian employees.

69. Defendant allowed one such similarly-situated employee ("M.I.") who is a Caucasian male, to transfer to another center after the employee failed to meet the $250,000 revenue generation goals set for him after the FY 2016 performance evaluation.

70. M.I. was allowed to move to the Power Systems Engineering Center at the same job level, to avoid being placed on a PIP in CPSS&R by the end of 2017.

71. Defendant allowed another similarly-situated employee ("M.M.") who is a Caucasian male, to remain employed and to avoid being placed on a PIP after the employee was unable to be accommodated in the Power Systems Engineering Center and Dr. Ibrahim was instructed by NREL HR that his demands for revenue generation from M.M. were insufficient grounds for placing M.M. him on a PIP, since this was not specified in the job requirements and interview at the time of M.M.'s hiring.

72. Defendant allowed another similarly-situated employee ("R.H.") who is a Caucasian male to resign after the employee failed to meet the revenue generation goal that was set six months earlier, and after a three-month extension had been granted to allow maximum opportunity for R.H. to turn things around.

73. R.H. was placed on a PIP based upon a negative evaluation from a previous Caucasian female supervisor; in so acting, Defendant ignored Dr. Ibrahim's input regarding the employee's performance.

74. In all three instances, Ms. Potter specifically instructed Dr. Ibrahim that terminating these employees (M.I., M.M. and R.H.) could expose the lab to age discrimination lawsuits, despite the fact that all three employees had a demonstrated failure to meet clearly-defined, reasonable performance goals based on their job levels at NREL, as well as through written communications from Dr. Ibrahim in their yearly performance evaluation.

75. Defendant took a very different approach with its termination of Dr. Ibrahim than it did in handling the employment situations of M.I., M.M. and R.H.

76. Defendant is liable for the acts and/or omissions of its agents and employees.

## **CLAIMS FOR RELIEF**

### **First Claim For Relief**
### **Discrimination Based on National Origin in Violation of Title VII**

77. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

78. Plaintiff satisfactorily performed the functions and requirements of his job at all times relevant to this Complaint.

79. Defendant, either directly or by and through its agents, discriminated against Plaintiff by Defendant because of his national origin.

80. Specifically, Plaintiff was discriminated against and/or treated in a differential fashion by Defendant and its agents because he is of Pakistani descent.

81. During Plaintiff's employment, Defendant, and its agents, engaged in unlawful discriminatory employment practices against Plaintiff with respect to the terms and conditions of

13

Plaintiff's employment based on his national origin.

82. Defendant's unlawful employment practices include, without limitation, the direct perpetuation of discrimination and harassment of Plaintiff by Mr. Torres and/or Ms. Potter, Defendant's failure to protect Plaintiff from discrimination and harassment at the hands of management and coworkers, Defendant's disparate treatment of Plaintiff from similarly-situated colleagues in changing his job title, in handling and responding to the purported complaints from the administrative assistant and the assistant consul, and in electing to terminate his employment, all of which denied Plaintiff equal terms and conditions of employment and otherwise adversely affected his employment status because of his Pakistani national origin.

83. Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

84. As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

## Second Claim For Relief
### Discrimination Based on Religion in Violation of Title VII

85. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

86. Plaintiff satisfactorily performed the functions and requirements of his job at all times relevant to this Complaint.

87. Defendant, either directly or by and through its agents, discriminated against Plaintiff because of his religious beliefs.

88. Specifically, Plaintiff was discriminated against and/or treated in a differential fashion by Defendant because he is Muslim.

89. During Plaintiff's employment, Defendant, and its agents, engaged in unlawful discriminatory employment practices against Plaintiff with respect to the terms and conditions of Plaintiff's employment based on his religious beliefs.

90. Defendant's unlawful employment practices include, without limitation, the direct perpetuation of discrimination and harassment of Plaintiff by Mr. Torres and/or Ms. Potter, Defendant's failure to protect Plaintiff from discrimination and harassment at the hands of management and coworkers, Defendant's disparate treatment of Plaintiff from similarly-situated colleagues in changing his job title, in handling and responding to the purported complaints from the administrative assistant and the assistant consul, and in electing to terminate his employment, all of which denied Plaintiff equal terms and conditions of employment and otherwise adversely affected his employment status because of his religious beliefs.

91. Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

92. As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

### Third Claim For Relief
### Discrimination Based on Race or Color in Violation of Title VII

93. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

94. Plaintiff satisfactorily performed the functions and requirements of his job at all times relevant to this Complaint.

95. Defendant, either directly or by and through its agents, discriminated against Plaintiff because of his race or color.

96. Specifically, Plaintiff was discriminated against and/or treated in a differential fashion by Defendant because he is Asian.

97. During Plaintiff's employment, Defendant, and its agents, engaged in unlawful discriminatory employment practices against Plaintiff with respect to the terms and conditions of Plaintiff's employment based on his race or color.

98. Defendant's unlawful employment practices include, without limitation, the direct perpetuation of discrimination and harassment of Plaintiff by Mr. Torres and/or Ms. Potter, Defendant's failure to protect Plaintiff from discrimination and harassment at the hands of management and coworkers, Defendant's disparate treatment of Plaintiff from similarly-situated colleagues in changing his job title, in handling and responding to the purported complaints from the administrative assistant and the assistant consul, and in electing to terminate his employment, all of which denied Plaintiff equal terms and conditions of employment and otherwise adversely affected his employment status because of his race or color.

99. Defendant is liable for the acts and/or omissions of its agents and employees.

100. Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

101. As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

### Fourth Claim For Relief
### Gender Discrimination in Violation of Title VII

102. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

103. Plaintiff satisfactorily performed the functions and requirements of his job at all

times relevant to this Complaint.

104. Defendant, either directly or by and through its agents, discriminated against Plaintiff because of his gender.

105. Specifically, Plaintiff was discriminated against and/or treated in a differential fashion by Defendant because he is male.

106. In particular, Defendant engaged in differential treatment of Plaintiff with respect to its investigations of the purported complaints submitted by the administrative assistant and/or the associate consul based on Plaintiff's gender.

107. During Plaintiff's employment, Defendant, and its agents, engaged in unlawful discriminatory employment practices against Plaintiff with respect to the terms and conditions of Plaintiff's employment based on his gender.

108. Defendant's unlawful employment practices include, without limitation, Defendant's disparate treatment of Plaintiff from similarly-situated colleagues in responding to the purported complaints from the administrative assistant and the assistant consul, and in electing to terminate his employment, all of which denied Plaintiff equal terms and conditions of employment and otherwise adversely affected his employment status because of his gender.

109. Female employees of the Defendant were not subjected to the scrutiny, criticism, discriminatory treatment, harassment or termination to which Plaintiff was subjected based on his gender.

110. For example, Mr. Torres and Ms. Potter demonstrated gender bias when they declared to Dr. Ibrahim, in discussing the purported allegations against him, that "guys say 'friends' when they want more."

111. Defendant is liable for the acts and/or omissions of its agents and employees.

112. Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

113. As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant, and award him the following relief, to the fullest extent allowed by law:

i. Actual economic damages as established at trial;
ii. Compensatory, including but not limited to future pecuniary and non-pecuniary losses, damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;
iii. Punitive damages on all claims allowed by law and in an amount to be determined at trial;
iv. Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;
v. Pre- and post-judgment interest at the highest lawful rate; and
vi. Any further relief that this court deems just and proper, and any other relief as allowed by law.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 12th day of October 2018.

MILLER & LAW, PC

**/s/ David J. Meretta**
David J. Meretta, CO Bar # 44409
1900 W. Littleton Blvd.
Littleton, CO 80120
(303) 722-6500
djm@millerandlaw.com

ATTORNEYS FOR PLAINTIFF